NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO M.L.

No. 1 CA-JV 22-0279
FILED 7-20-2023

---

Appeal from the Superior Court in Maricopa County
No. JS519839
The Honorable Sigmund G. Popko, Judge, *Pro Tempore*

**AFFIRMED**

---

COUNSEL

Guymon Law, Chandler
By Amber L. Guymon
*Counsel for Appellant*

Law Office of Roman A. Kostenko, PLC, Phoenix
By Roman A. Kostenko
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Judge Brian Y. Furuya delivered the decision of the Court, in which Chief Judge David B. Gass and Judge Andrew M. Jacobs joined.

---

**F U R U Y A**, Judge:

**¶1** M.L.'s father ("Father") appeals the superior court's order denying his petition to terminate the parental rights of the child's mother ("Mother"). Because we hold a parent may not rely on their own violations of court orders to establish another parent's abandonment, and for other following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2** Father and Mother lived in Colorado at M.L.'s birth in 2013. In 2014, Mother petitioned the Colorado family court to determine parenting time and decision-making for M.L. The Colorado court approved the parents' stipulated parenting plan. The resulting order established Mother as M.L.'s primary residential parent but allowed Father parenting time and ordered him to pay child support. It also gave the parents joint legal decision-making authority.

**¶3** Father moved to modify the order after seven months, raising concerns about Mother's adherence to it and asserting she was neglecting M.L. While his petition to modify was pending, Father repeatedly reported Mother to Colorado's Division of Child Welfare, saying Mother was abusing substances. Though mother delayed testing, her subsequent drug tests were negative.[1]

**¶4** In 2016, the Colorado court granted a stipulated modification ("First Modification"). It gave Father final decision-making authority for two years and then reverted to joint legal decision-making. As to parenting time, Father became M.L.'s primary residential parent; Mother was awarded parenting time and ordered to pay Father child support.

---

[1] Father also encouraged others to report Mother. Though Mother refused to submit to the initial drug test for several months, she eventually tested negative. Also, M.L. needed major dental work after being in Mother's care, which could be construed as some evidence of neglect.

Ultimately, Mother remedied the concerns Father had raised about her parenting, and she consistently exercised her parenting time.

¶5          Two months after the First Modification, Father moved to relocate the child to Arizona because his employer planned on promoting him and he claimed his salary would substantially increase. The Colorado court approved Father's relocation in another modification order ("Second Modification"). The court also noted the large discrepancy between the parents' incomes and made the relocation contingent on Father earning a higher salary and on his returning to Colorado with M.L. at least one weekend a month so Mother could exercise her parenting time. Additionally, the Second Modification provided M.L. would spend all her summers and fall breaks with Mother, and the parents would alternate holidays and spring breaks and split Christmases. The order further allowed Mother to exercise parenting time in Arizona at her discretion if she gave Father at least 14 days' notice. The court allocated to Father 85 percent of the travel costs for Mother's summer, holiday, and school break parenting time visits and 15 percent to Mother. It also reiterated prior legal decision-making orders requiring Father to consult Mother on any major decisions for M.L. 14 days before taking any action. The Second Modification required no child support from either parent.

¶6          Mother appealed the Second Modification. The Colorado appellate court indicated that conditioning Father's ability to move on a higher salary was contrary to Colorado law but nevertheless affirmed the order because he had already moved to Arizona.

¶7          Mother continued to exercise her parenting time in Colorado until September 2017, when Father, his girlfriend (now wife), and M.L. relocated to Arizona. After relocating, Father returned to Colorado with M.L. only four times: one day in October 2017,[2] three days in November 2017, two days in December 2017, and two days in January 2018. During the December trip, Father refused to allow Mother to visit M.L. longer than one day. Father did not tell Mother about any later trips to Colorado, though he admitted he returned six times a year. And Father acknowledged he never consulted Mother about any legal decisions for M.L. Mother did not ask the court for help in addressing Father's violations.

¶8          Meanwhile, Mother attempted video calls with M.L. on several occasions, but the parents could not get them to work. Instead, she

_____

[2]      The record indicates Mother was unable to exercise her parenting time during this trip.

called M.L. semi-regularly through summer 2019. From July 2019 to October 2021, Mother had no contact with M.L., contributed no support, and sent her no cards, gifts, or letters. At one point, Mother tried to send a money order to Father that he rejected.

¶9 In April 2021, Father filed a petition to terminate Mother's parental rights to M.L. based on grounds of abandonment in the juvenile division of the Arizona superior court. An adoption manager filed a social study recommending Mother's parental rights be terminated.

¶10 Mother renewed her requests to visit with or speak to M.L. in October 2021 and again from May through July 2022. Father refused these requests, citing the pending termination petition. In July 2022, Mother traveled to Arizona, but Father refused her repeated requests to spend time with M.L.

¶11 In January 2022, Mother moved to enforce the provisions of the Second Modification in the family division of the Arizona superior court. The family division stayed that matter pending resolution of this (the juvenile) case. After trial, the juvenile division denied Father's petition, finding Father's interference and hostility gave Mother just cause for failing to maintain a normal parental relationship with M.L. Father appealed. We have jurisdiction under Article 6, Section 9 of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") §§ 8-235(A), 12-120.21(A), and 12-2101(A).[3]

## DISCUSSION

¶12 Father appeals the denial of his petition to sever Mother's parental rights, arguing (1) the court failed to consider a social study's recommendation to terminate Mother's parental rights, (2) issue preclusion barred some of the court's findings, given the prior Colorado litigation concerning related matters, and (3) the evidence was insufficient to support findings that (a) Mother had just cause for the interruption in contact with

---

[3] Because Mother still lives in Colorado, Colorado retained subject matter jurisdiction over matters relating to M.L.'s care under the UCCJEA. *See* A.R.S. §§ 25-1001 to -1067. However, Division 25 of the Arapahoe Combined Courts of Colorado relinquished jurisdiction to Arizona over custody decisions concerning M.L. on February 16, 2022. A.R.S. § 25-1037 (establishing that a court may decline to exercise jurisdiction if it determines it is an inconvenient forum).

M.L. and (b) Mother had limited means. Reasonable evidence supports the juvenile court's findings, so we affirm.

## I.      The Standards of Proof and Review

¶13      A parent's right to the companionship, care, custody, management, and association of her children is a fundamental, constitutionally protected right. *Michael M. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 198, 200 ¶ 8 (App. 2002). These fundamental rights do not evaporate simply because the natural parent has not been a model parent. *Id.* Termination of a parent-child relationship should be considered only as a last resort when concerted efforts to preserve the relationship have failed. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 253–54 ¶ 39 (2000) (Zlaket, J., concurring in part) (noting several cases citing this central rule).

¶14      Although a parent's right to custody and control of her own child is fundamental, it is not absolute. *Id.* at 248–49 ¶¶ 11–12. Severance of a parental relationship may be warranted where the State or an interested party proves at least one statutory ground under A.R.S. § 8-533 by "clear and convincing evidence." *Id.* "Clear and convincing" means the grounds for termination are "highly probable or reasonably certain." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284–85 ¶ 25 (2005) (citation omitted). After finding the presence of a ground under § 8-533 by "clear and convincing evidence," the court must also find that severance is in the child's best interest by a preponderance of the evidence. *Id.* at 288 ¶ 42.

¶15      On review, we "accept the juvenile court's findings of fact unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 4 (App. 2002). We do not reweigh the evidence, and only inquire whether adequate evidence sustains the court's ruling. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47 ¶ 8 (App. 2004).

## II.     The Court Adequately Considered the Social Study Recommending Termination of Mother's Parental Rights.

¶16      Father argues the juvenile court erred by not adopting the social study's recommendation to terminate Mother's parental rights to M.L. Although A.R.S. § 8-536(A) requires the court to consider the recommendation of a social study (unless the requirement is waived under subsection (C)), the statute does not require the court to follow the recommendation. Indeed, such a requirement would be improper, as the court cannot delegate its duty to make an independent determination based

on the evidence. *See* Arizona Rules of Procedure for the Juvenile Court 353(h); *Alexander M. v. Abrams*, 235 Ariz. 104, 108 ¶ 19 (2014) (holding juvenile court impermissibly delegated its duty to independently determine whether reunification was in children's best interests to a state agency).

**¶17**        Even so, Father contends "it was error for the Court to simply discount the [social study] because the author did not believe there was 'just cause' for Mother's absence." However, the court recognized "that the social study . . . supports termination." Its further comments show it carefully considered the social study and the corresponding testimony from its author but ultimately came to a different result. On this record, we find no error.

### III.    Issue Preclusion Did Not Prevent the Juvenile Court from Making Findings in this Case.

**¶18**        Father argues the juvenile court was barred from making certain factual findings because the Colorado family court previously decided the same issue.[4] For instance, the Arizona juvenile court found Father "disturbed an improving situation" when he relocated. Father asserts that because the Colorado court found Mother was progressing in her parenting skills and still allowed him to move, the Arizona juvenile court's finding is contradictory to the Colorado order. But to be applicable, the doctrine of issue preclusion requires the first court that hears an issue to apply an equal or greater burden of proof than the second court. *See Crosby-Garbotz v. Fell in & for Cnty. of Pima*, 246 Ariz. 54, 59–60 ¶¶ 20, 26 (2019) (holding state could not re-litigate issue under a higher, criminal burden of proof after losing the same issue under a lower, civil burden of proof). And the precluded issue must be precisely the same as the issue resolved in the previous litigation. *State v. Whelan*, 208 Ariz. 168, 172 ¶ 13 (App. 2004).

**¶19**        Here, the Colorado court permitted Father's relocation after analyzing factors under Colo. Rev. Stat. § 14-10-129(2)(c). However, Arizona has a different set of factors, outlined in A.R.S. § 25-408(I).

---

[4]        Although Father's brief uses the label res judicata (claim preclusion), the substance of his argument raises collateral estoppel (issue preclusion). It is clear the Colorado court that determined the parents' family case and the Arizona juvenile court that addressed only the termination petition were not deciding the same claims. *See Circle K. Corp. v. Indus. Comm'n of Ariz.*, 179 Ariz. 422, 425–26 (App. 1993).

Therefore, issue preclusion does not prevent an Arizona court from making findings regarding issues about which a Colorado court has already made findings. *See Crosby-Garbotz*, 246 Ariz. at 59–60 ¶¶ 20, 26.

¶20         Moreover, the Arizona and Colorado courts were deciding two different issues. The Colorado court analyzed factors to determine whether to modify the previous family court orders. *See* Colo. Rev. Stat. § 14-10-129(2)(c). Part of that analysis required it to determine the impact the move would have on Mother's parenting time and her relationship with M.L. *Id.* Nevertheless, nowhere in the court's findings did it determine the move would not disturb that relationship. At most, the Colorado court found it could fashion a reasonable parenting time schedule that would give Mother the opportunity to maintain a relationship with M.L. The Arizona juvenile court, on the other hand, decided whether Mother had just cause for failing to maintain that relationship. It therefore did not err in considering, among other evidence, the actual effect Father's move—and his nonadherence to the family court orders—had on Mother's relationship with M.L. and making the finding to which Father objects.

¶21         Father also challenges the juvenile court's finding he acted with hostility towards Mother by alleging numerous times she was using drugs in Colorado, though she always tested negative. He argues that because the Colorado court did not expressly find Father's actions hostile or raise it as a concern in the family case, the juvenile court is somehow precluded from making such a finding in this case. At most, the Colorado court found the parents were working well together in adjusting parenting time when necessary. This is not synonymous with a finding that Father was never hostile towards Mother, especially when the two courts were deciding two different claims five years apart. Issue preclusion does not apply here, and we discern no error on that basis.

## IV.     Reasonable Evidence Supports the Juvenile Court's Findings.

¶22         Finally, Father argues insufficient evidence supports the juvenile court's findings. Specifically, Father challenges the court's determinations Mother had just cause for failing to maintain a normal relationship with M.L. and Mother's limited means.

### A.     Mother Had Just Cause for Failing to Maintain a Normal Parental Relationship with M.L.

¶23         Parents may forfeit their parental rights if they abandon their child. A.R.S. § 8-533(B)(1). Abandonment occurs when the parent fails to "provide reasonable support and to maintain regular contact with the child,

including providing normal supervision." A.R.S. § 8-531(1). Abandonment is measured by a parent's conduct, not her subjective intent. *Michael J.*, 196 Ariz. at 249–50 ¶ 18. The court must consider whether the parent has "provided reasonable support, maintained regular contact, made more than minimal efforts to support and communicate with the child, and maintained a normal parental relationship." *Id.* Additionally, a parent must act persistently to pursue the parent-child relationship, despite any obstacles that may arise. *Id.* at 250 ¶ 22.

**¶24** Failure to maintain a normal parent-child relationship without just cause for a period of six months is prima facie evidence and creates a rebuttable presumption of abandonment. A.R.S. § 8-531(1). A parent may rebut that presumption by showing just cause, including that the other parent "persistently and substantially restricted [her] interaction with [her] child." *Calvin B. v. Brittany B.*, 232 Ariz. 292, 293 ¶ 1 (App. 2013). In *Calvin B.*, the parents obtained a family court order that made the mother the primary parent but allowed father "liberal [supervised] visitation as his schedule allows." *Id.* at 294 ¶ 2. The mother then limited the father's parenting time and nullified his attempts to seek redress in court by obtaining protective orders against him. *Id.* at 294–95 ¶¶ 3–8. Eventually, she ended the visits altogether and ignored father's requests for parenting time in violation of the order. *Id.* at 295–96 ¶¶ 8–10, 14. We held that a parent "who has persistently and substantially restricted the other parent's interaction with their child may not prove abandonment based on" the other parent's "limited involvement with the child." *Id.* at 293–94 ¶ 1.

**¶25** Here, Father points to the period of two years where Mother made no efforts to maintain her relationship with M.L. But the court must consider all the circumstances in a case, including those existing at the time of trial. *See In re Appeal in Pima Cnty. Juv. Severance Action No. S-114487*, 179 Ariz. 86, 96 (1994); *cf. Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330 ¶ 22 (App. 2007).

**¶26** After considering all the evidence, the court found that because "Father waged a relentless effort to place obstacles in Mother's parenting path," Mother demonstrated just cause and rebutted the statutory presumption of abandonment. Ultimately, the court found that due largely to Father's interference with Mother's efforts to continue a relationship with M.L., he had failed to prove abandonment by clear and convincing evidence. Reasonable evidence supports the court's findings.

**¶27** Mother is a single parent of multiple children and testified without contradiction that her employment generally consists of working

at grocery and department stores. Notwithstanding her limited means, Mother established a long-standing relationship with M.L. She was M.L.'s primary parent for about three years until the First Modification changed that arrangement. Nevertheless, Mother consistently exercised her parenting time until Father and M.L. moved to Arizona. And despite limited financial means, Mother consistently fought for her relationship with M.L. in the Colorado family court, eventually declaring bankruptcy due to her accumulated legal fees.

¶28 The Colorado court allowed Father to relocate M.L. based on his own representations that he could regularly return to Colorado. Indeed, the Colorado family court crafted the Second Modification order specifically to give Mother "the opportunity to maintain [her] relationship with" M.L. and ordered Father to give Mother "at least a weekend a month" of parenting time by returning with the child to Colorado. But after Father moved to Arizona, he did not comply with that order, depriving Mother of her monthly in-person parenting time for almost four years. Additionally, during one of his few trips back, Father wrongfully limited her parenting time by refusing her the full weekend. Although he never notified Mother of any further trips to Colorado, Father stated to the social study author that he returns there about six times a year to visit his family.

¶29 Once Father denied visits, Mother's next best option for contact was video calls, which she attempted numerous times. During some of those times, Father stated he could not get the videos to work. Mother also had trouble getting the videos to work.

¶30 Even at that, Mother did not stop trying to maintain her relationship with M.L., trying phone calls with five-year-old M.L. through July 2019.[5] Mother testified that speaking to M.L. over the phone "was hard because [the child] did not know who she was speaking with, despite [Mother's] best efforts to help [her] understand." Indeed, the juvenile court cited Mother's testimony that when she would call, Father would refer to her as "aunt" rather than mother, a violation of the First Modification. Although Father disputes this, Mother's testimony is sufficient to support the finding. *See Jesus M.*, 203 Ariz. at 282 ¶ 12 ("The resolution of such conflicts in the evidence is uniquely the province of the juvenile court as the trier of fact; we do not re-weigh the evidence on review.").

---

[5] Father testified that Mother called M.L. six times in 2018, but the record indicates she asked for contact at least twelve times.

¶31 Further, from May 2018 to May 2019, Mother made various requests to see M.L. in-person over summers and at Christmas.[6] During one of these requests, Father refused to allow Mother to pick up M.L. until she paid her share of previous Colorado trips.[7] The Second Modification does not explain what happens if Mother fails to pay her 15% of travel costs, but as the court found, Father's remedy is not to withhold parenting time. In any event, Father refused money Mother offered him. Finally, Father never consulted Mother about any major decisions for the child, as the Second Modification required.[8]

¶32 Under these circumstances, Mother stopped calling M.L. or communicating with Father about her until after September 2021. Father argues "[t]he burden to act as a parent rests with the parent, who should assert his legal rights at the first and every opportunity." *Michael J.*, 196 Ariz. at 251 ¶ 25 (citing *S-114487*, 179 Ariz. at 98). Though the principle is generally true, *S-114487* is distinguishable on its facts. In *S-114487*, an unwed father had not shown he had *established* a parental relationship with his newborn child. *S-114487*, 179 Ariz. at 98. By contrast here, Mother had a years-long relationship with M.L. until Father chipped away at that foundation by wrongfully withholding parenting time.

¶33 Indeed, Father's breach of the Colorado family court orders is prodigious. Had he complied, Mother would have had at least monthly opportunities to visit and maintain her relationship with M.L. As Mother testified, maintaining a strong bond with her five-year-old child over the phone rather than in person was itself difficult. And here, Father increased that difficulty by referring to Mother as "aunt," so M.L. did not know who she was talking to. Given Mother's limited financial means, she had few

---

[6] When Mother asked Father if he was bringing M.L. for the summer, Father replied, "You have to come get her it's your time." The Second Modification does not resolve this issue, but the First Modification states, "The party whose parenting time is starting will be responsible for the transportation of the child." Nonetheless, the Second Modification made Father responsible for 85% of the costs of this proposed travel.

[7] In this same exchange, Father also incorrectly claimed the parents shared summers and that it was his summer with M.L.

[8] After September 2018, the parents again shared joint legal decision-making authority. But Father did not consult Mother on any decisions before or after the reversion.

options, but the court found credible her testimony that if she had the resources, she would have exercised her parenting time and sought redress.

¶34        True, Mother might have continued her efforts to contact M.L. during the two-year period of estrangement, but in the face of continual and active opposition, a parent's efforts need not be perfect. *See Calvin B.*, 232 Ariz. at 293–94 ¶¶ 1, 6 (finding persistent and substantial interference though father delayed completing a court-ordered parenting class and did not pay child support). When Mother stopped reaching out, Father had already denied her in-person parenting time for almost two years and had relegated her to the more distant role of "aunt" by misleading M.L. as to Mother's identity. Moreover, the record suggests further efforts during this time would have been futile because Father denied Mother's renewed efforts at contact with M.L. During this time, Mother asked Father to bring M.L. to Colorado as the order required, set up video visits, phone calls, send pictures, send messages of love to M.L., and to allow her parenting time when she visited Arizona. Father rejected these requests and refused to communicate with her further, directing her to speak to his attorney. Thus, the record shows Father has repeatedly violated court orders in an effort to isolate M.L. from Mother. Considering Father's active, substantial, and persistent interference with Mother's parenting time and of her other efforts to maintain a relationship with M.L., we find no error in the juvenile court's determination that Father failed to prove abandonment by clear and convincing evidence.

¶35        Nevertheless, Father contends the court erred by focusing solely on his communication with Mother after petitioning for termination. The court's order is thorough and shows the court considered all the evidence, not just communication after the petition. And, as discussed above, Father's wrongful withholding of parenting time began years before he petitioned to terminate Mother's parental rights. Nor does Father explain why petitioning to terminate Mother's rights justifies withholding her parenting time.

¶36        Accordingly, reasonable evidence supports the court's findings that Father's actions constitute just cause for Mother's failure to maintain a relationship with M.L.

### B.        Mother's Limited Means

¶37        The juvenile court found "Mother is of limited means while Father is decidedly situated in the economic middle class" and considered this discrepancy while making its abandonment determination. Father

11

challenges the court's findings that Mother was of "limited means" and unable to provide M.L. reasonable support. Again, his argument is predicated on sufficiency of the evidence to support the court's finding.

**¶38** There is some indication in the record Mother's hourly wages had improved since entry of the Second Modification. Father indicates Mother occupies an upscale rental home and could afford to make a trip to Arizona among other evidence Mother is of greater, not lesser, means since the Second Modification. However, most of the expenditures Father points to, such as Mother's rental home in Colorado and her trip to Arizona, were paid for by friends.

**¶39** Mother's uncontroverted testimony is she works only part time and attends school. Father suggests Mother makes more than the $1,820 monthly earnings found by the juvenile court. But her current wage with part-time hours equates to even less than that. And neither evidence nor argument before the juvenile court established that Mother's return to school imperiled M.L. financially or was so unreasonable as to require attribution of full-time wages due to underemployment. *See Little v. Little*, 193 Ariz. 518, 522–23 ¶ 13 (1999) (juvenile court must consider a range of factors in determining whether a decision to leave employment is reasonable, and therefore, constitutes underemployment). And because reasonable evidence supports the court's findings, we will not reweigh that determination on appeal. *Mary Lou C.*, 207 Ariz. at 47 ¶ 8. We therefore perceive no error.

## CONCLUSION

**¶40** We affirm.

**¶41** As the prevailing party on appeal, we award Mother her taxable costs upon compliance with Arizona Rules of Civil Appellate Procedure 21.



AMY M. WOOD • Clerk of the Court
FILED:     AA